IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------X
                   :
GEORGE COREY              :          3:14 CV 1266 (JAM)
                   :
V.                   :
                   :
PATRICK HAWES ET AL.     :          DATE: SEPTEMBER 17, 2015
                   :
-------------------------------------------------------X

<u>RULING ON PLAINTIFF'S APPLICATION FOR PREJUDGMENT REMEDY</u>

On September 4, 2014, plaintiff George Corey, appearing <u>pro se</u>,[1] filed his Complaint

(Dkt. #1), followed by an Amended Complaint, filed December 31, 2014 (Dkt. #12) against

six defendants: Patrick Hawes, who is a State Police Officer assigned as a Resident State

Trooper to the Town of East Haddam;[2] Patricia Williams and George W. Crouch, Jr., who are

plaintiff's neighbors in East Haddam; the Town of East Haddam; Mark Walters, who is the

Chief of Police of East Haddam; and Mark Creighton,[3] who is a police officer in East Haddam.

(At 3-4).[4]

On February 6, 2015, plaintiff filed the pending Application for Attachments and

---

[1]On March 9, 2015, plaintiff filed a Motion to Accept or Permission to Allow <u>Pro Se</u>
Assistance (Dkt. #53), in which he sought the assistance of Phillip H. Inkel; three days later, U.S.
District Judge Jeffrey A. Meyer granted the motion but advised that Inkel was not permitted to "file
papers on plaintiff's behalf or otherwise purport to represent or speak on plaintiff's behalf."  (Dkt.
#55).  On July 14, 2015, counsel filed his appearance in this case on behalf of plaintiff and his wife,
Debbie Corey (Dkt. #118), so that Judge Meyer's order of March 12, 2015 was revoked.  (Dkt.
#125).

[2]<u>See</u> note 17 <u>infra</u>.

[3]<u>See</u> note 16  <u>infra</u>.

[4]On June 15, 2015, a second Amended Complaint (Dkt. #106) was filed on behalf of
plaintiff, his wife, Debbie Corey (using her nickname), and Inkel, which added seven new
defendants in addition to the seven original defendants. Plaintiffs' attorney withdrew this amended
complaint, so that this case is preceding under the First Amended Complaint brought only by
plaintiff Corey. (Dkts. ##134, 136, 140-41, 119-23, 127; <u>see also</u> Dkts. ##109-14).

Prejudgment Remedies ["PJR"](Dkt. #43) against defendants Williams and Crouch,[5] seeking an attachment of at least $300,000.  Five days later, U.S. District Judge Jeffrey A. Meyer referred this motion to this Magistrate Judge. (Dkt. #44).  A three-day evidentiary hearing was held on plaintiff's PJR application on June 3-5, 2015, at which Jason A. Lynch, Debra Corey (plaintiff's wife), defendant Patricia Williams, defendant George Crouch, Dr. Tanya Russo (plaintiff's therapist), defendant Mark Creighton, defendant Patrick Hawes and plaintiff all testified for plaintiff; defendants called no witnesses. (Dkts. ##99-100, 102, 131-33[6]; see also Dkts. ##57-58, 61-62, 67-68, 71-73, 77-78, 85-98).[7]  On August 28, 2015, defendants Williams and Crouch filed their post-hearing brief (Dkt. #142), and plaintiff filed his post-hearing brief the next day (Dkt. #143); on September 11, 2015, defendants  filed their reply brief.  (Dkts. ##144; see also Dkts. ##101, 103, 125, 129-30, 135).

For the reasons set forth below, plaintiff's PJR application (Dkt. #43) is denied.

## I.  FACTUAL BACKGROUND

For more than thirty years, plaintiff Corey has resided with his wife, Debra Corey, at 30 Ackley Cemetery Road, East Haddam, a 2.05 acre parcel of land located behind the property of defendant Williams,[8] 28 Ackley Cemetery Road, East Haddam, which is a 10.87

---

[5]On February 26, 2015, defendants Williams and Crouch filed a Motion to Dismiss (Dkt. #48), which Judge Meyer denied in an oral ruling on April 2, 2015.  (Dkt. #74).  Defendants Crouch and Williams filed their Answers and Affirmative Defenses on April 28, 2015.  (Dkts. ##75-76).

[6]The transcript for the afternoon of June 3, 2015 ["6/3/15 Tr."] is Dkt. #131; the transcript for June 4, 2015 ["6/4/15 Tr."] is Dkt. #132; and the transcript for June 5, 2015 ["6/5/15 Tr."] is Dkt. #133.  There is no transcript for the morning of June 3, 2015, for which the Magistrate Judge relies upon her detailed notes.

[7]Many of the exhibits were submitted with highlighter or handwriting already on them; some also were copied with unrelated handwritten exhibit stickers.

[8]Defendant Williams became the sole owner of this property following her divorce from her first husband in 1990; they had purchased the home in 1984.  (Williams Testimony; Exhs. D-E).

acre parcel of land, which she has shared with her long time boyfriend, defendant Crouch, for twenty-seven years.  (Debra Corey Testimony;  6/3/15 Tr. at 91; 6/4/15 Tr. at 28; 6/5/15 Tr. at 88-89, 90-91; Exhs. 14-15, D-F). The Coreys' access to their property is through a fifty foot wide right of way that runs from Ackley Cemetery Road through the Williams property, which driveway is also used by defendants Williams and Crouch (Debra Corey Testimony; Williams Testimony; 6/4/15 Tr. at 98; 6/4/15 Tr. at 25, 26, 27, 29; Exhs.  2, 5, 14-15, A, B-8, C, H-2, H-4, I); plaintiff's access to, and use of, this right of way forms the basis for this lawsuit.[9]

Defendant Crouch testified that on Friday, March 8, 2013, after a snowstorm, he attempted to remove snow from the shared driveway using a snow blower, but was unable to complete the task because the machine broke; however, in Crouch's words, the "driveway was passable."  (6/3/15 Tr. at 96; Exh. 4).

The incident at issue here occurred on Saturday, March 9, 2013, when the Coreys' family friend, Jason A. Lynch, turned into the shared driveway to arrive at a celebration in honor of his birthday, which was the prior day; approximately halfway up the driveway, his 2006 Honda Accord became stuck in the snow and he was unable to free it.  (Lynch Testimony; 6/5/15 Tr. at 59).[10]  After being alerted to Lynch's predicament, plaintiff left his home to assist Lynch; when the two were unsuccessful in freeing the vehicle by hand, plaintiff and Lynch returned to the house to get plaintiff's Bobcat brand loader ["Bobcat"] and both gentlemen rode back down the driveway in the Bobcat; plaintiff and Lynch testified that

---

[9]There is a third neighbor whose property sits behind the Corey property, who also uses this right of way.  (6/5/15 Tr. at 115).

[10]Plaintiff and defendant Crouch both agree that the driveway is about twenty-five feet wide, and that these trees are located at the edge of the driveway, "in the middle of the right of way."  (6/3/15 Tr. at 98-100; 6/5/15 Tr. at 87-88).

in the process of towing the Honda out of the snow, the Bobcat hit some "dilapidated hemlocks" in the right of way, "severely damag[ing]" them, but that plaintiff did not strike the trees intentionally or with any criminal intent to damage them.  (Lynch Testimony; 6/5/15 Tr. at 59-60, 73-74, 75-76).[11] Mrs. Corey watched the activities from a window in the house, along with another family friend, William Corsack.  (Debra Corey Testimony).[12] Plaintiff did not deny pushing two trees over or scraping them, but explained that he did not do so "out of anger[,]" but rather "due to the condition of the driveway[,]" and that in the process of freeing the Honda, he "slid[] into the freaking trees in front of [defendant Crouch's] camper[,]" and "kept rocking and . . . rocking" the Bobcat to "get free[,]" until he "caught something and it went back on the trees and the trees just went down like that[.]"  (6/5/15 Tr. at 60-61, 74-75). Plaintiff added that the Bobcat "was sliding all over[]" because "the driveway was just a sheet of freaking ice[,]" he had "very little control over the machine[]" which he testified weighs approximately nine thousand pounds, and  he was "trying not to hit [Lynch's] new car."  (Lynch Testimony; 6/5/15 Tr. at 60, 74, 76).  Plaintiff admitted that once he was able to free Lynch's car, he went up the driveway and "dumped [the snow he had scooped up] on the opposite side of the driveway where [defendants Williams and Crouch's] car was parked[,]" but not directly behind defendant Williams' car, before returning home.  (6/5/15 Tr. at 76, 78).

Plaintiff testified that the hemlock trees are on the northerly side of the driveway, which prevents the sun from melting the accumulated snow.  (6/5/15 Tr. at 61).  According

---

[11]These trees have been referred to as hemlock trees and by the more generic title of evergreen trees.

[12]Mrs. Corey and plaintiff testified that plaintiff had also removed Corsack's car from being stuck in the snowy driveway.  (Debra Corey Testimony; 6/5/15 Tr. at 59, 93-94).

to plaintiff and Mrs. Corey, these trees (which had been planted by Mrs. Corey's father approximately forty to forty-five years ago) are in the right of way, and for most of the time that they have lived at 30 Ackley Cemetery Road, plaintiff maintained the driveway by using the Bobcat as a plow and by treating the surface with salt and sand; however, he ceased this practice after he received a letter from defendants Williams and Crouch's attorney, Irving Shurberg, dated December 30, 2003.   (Debra Corey Testimony; 6/5/15 Tr. at 61; Exh. A). This letter advised the Coreys that they

> only have the right to use the right of way for access to your property.  Such use is limited to reasonable use and you are not free to treat the right of way as your own property, which it is not.  Racing of vehicles, cutting of trees, piling of dirt, and other such abuses will not be tolerated.

 (Exh. A).[13]  Mrs. Corey testified that sometimes municipal employees of East Haddam would plow the driveway but that stopped when defendant Crouch complained to town officials. (Debra Corey Testimony).[14]  Plaintiff testified that defendant Crouch spends six hours using a snow blower on only part of the driveway, which still leaves two to three inches of snow on the ground.  (6/5/15 Tr. at 61, 63).  According to plaintiff and Mrs. Corey, defendant Crouch only plows the snow from half of the driveway, namely from the street to the carriage

---

[13]The Coreys' attorney, Terrence J. Milardo, responded in a letter, dated January 22, 2004, which provided as follows:

> [T]he Coreys are entitled to reasonable use of the right of way.  In order for the Coreys to enjoy that reasonable use requires them to maintain the right of way by removing obstacles such as snow or anything that impedes their ingress or egress. Obstructions of any kind, including fences[,] should not be put up within that [fifty]-foot wide area.  You are both responsible for the upkeep of the right of way. You are both financially liable for such upkeep.

(Exh. 5).

[14]Defendant Crouch denied having made such complaint and claimed that in the twenty-seven years that he has lived with defendant Williams, he did not recall any town employees ever having plowed the driveway.  (6/4/15 Tr. at 35).

house, and from the carriage house to the pasture.  (Debra Corey Testimony; Exhs. 2-3, B-8, C, H-2, H-4, I).

According to Mrs. Corey, the portion of the driveway from the street to the carriage house (which is approximately five hundred to seven hundred feet) is paved, and the remaining five hundred feet is an unpaved gravel driveway.  (Debra Corey Testimony; Exhs. 2-3, B-8, C, H-2, H-4, I).  She further explained that the driveway is flat from the street to the area where the hemlock trees are, but becomes "steep" after that.  (Debra Corey Testimony; Exhs. 2-3, B-8, C, H-2, H-4, I).  Mrs. Corey complained that they "cannot get up the driveway" beyond the carriage house, "it's just a mess," and the condition is "bad." (Debra Corey Testimony).  Mrs. Corey testified that their family members, friends, and other company have gotten stuck in the driveway, including her elderly mother who became stuck twice during the previous winter. (Debra Corey Testimony).  Mrs. Corey further testified that whenever her husband tried to remove limbs from any of these trees, defendants Williams and/or Crouch would call the police, which continues to occur "up to this day."  (Debra Corey Testimony).  Plaintiff testified that he has been instructed on two occasions not to "touch" the driveway, and that the state of the driveway now, with partially removed trees, is particularly dangerous in the winter.  (6/5/15 Tr. at 93, 111-14).  Plaintiff would prefer that both residences share the responsibility of properly maintaining the shared driveway. (6/5/15 Tr. at 115).

Defendant Williams agreed that these hemlock trees are in the right of way, and testified that they are close to where she and defendant Crouch park their own vehicles, which includes her camper.  (Williams Testimony; 6/3/15 Tr. at 80-81; Exhs. 2, B-3, B-4, B-7, B-8, C-1).  Defendant Crouch testified that in addition to these trees, there are several other items in the midst of the right of way, including a structure, a parking area, pre-existing

6

ornamental boulders, a pre-existing fence line, and a pre-existing telephone line.  (6/4/15 Tr. at 24-27, 36; Exh. I).  Defendant Williams denied that the Coreys were ever told not to "touch" the driveway, but rather were instructed not to park vehicles in the right of way after a previous winter during which plaintiff had left construction vehicles, including a trailer, in the driveway for the entire winter.  (Williams Testimony).  She testified that plaintiff was not forbidden from trimming branches along the driveway or from snow plowing the half of the driveway leading to his house, but in the past, he had inappropriately taken down some trees to create a parking space.  (Williams Testimony).  She believed that Attorney Shurberg's letter illustrated some of the unreasonable uses of the right of way.  (Williams Testimony; Exh. A).  Defendant Williams added that sometime in 2013, she and defendant Crouch asphalted the driveway, including plaintiff's portion, for which the Coreys never offered any money.  (Williams Testimony).

According to defendant Crouch, the driveway is approximately two hundred yards long, of which he attends to one hundred and fifty yards of it.  (6/3/15 Tr. at 109-10).  Similar to his girlfriend's testimony, defendant Crouch did not recall any blanket prohibition against plaintiff using his Bobcat on the driveway, but only that the Coreys are to "pass up and down safely without causing damage."  (6/3/15 Tr. at 125-26, 134).  Defendant Williams further testified that at some point, the parties had discussions about a maintenance agreement by which plaintiff would be able to use the Bobcat on the right of way provided that he stopped "piling . . . dirt at the side of the driveway and making it look awful[,]" but plaintiff never did that and the dirt piles have been "there for years now."  (6/3/15 Tr. at 86-87).  Defendant Crouch confirmed that there is no agreement on the land record regarding maintenance of the right of way.  (6/4/15 Tr. at 29).  Defendant Crouch denied ever having placed stones, boulders or pallets in the driveway to block the Coreys' access.  (6/4/15 Tr.

7

at 19-20, 29).

Defendants Williams and Crouch testified that they were watching television in their living room on March 9, 2013 when they heard a "loud noise," described as a "loud metallic bang"; when they looked out their window, they saw plaintiff on his Bobcat, dumping snow behind defendant Williams' Prius; they had concerns that plaintiff's activities would bring down the nearby electric wires and the vehicle was close to the evergreen trees.  (Williams Testimony; 6/3/15 Tr. at 93-94, 98, 6/4/15 Tr. at 31-32; Exh. 13 (showing electric wires running through trees)).  With defendant Williams present, defendant Crouch called the East Haddam Police Department from their home to report that plaintiff, their neighbor, was in their driveway in his Bobcat, knocking down their trees with the bucket of his Bobcat, and thereafter defendant Crouch left the house to determine what had happened but returned when he saw plaintiff "become angry[,]" "yelling[,]" "cursing[,]" "waving [his] arms in the air[,]" and "start[]" to "ram[] the trees[]" or "scrap[e] the trees[.]"  (Williams Testimony; 6/3/15 Tr. at 91-92, 104; 6/4/15 Tr. at 32, 37-38, 43-44).   Defendants Williams and Crouch remained on the sidewalk or parking area (which is approximately a thirty foot square), and witnessed plaintiff knock the trees over; in defendant Williams' view, the Bobcat was not "sliding" in the snow and the incident "did not appear [to her] to be an accident[.]"  (Williams Testimony; 6/4/15 Tr. at 37-39).

After they returned inside, they continued to view "the trees being pushed into the yard, knocked down, one after another[,]" approximately five to six of them, in addition to the "several" they had seen while standing outside.   (6/4/15 Tr. at 39-42).   Defendant Crouch testified that the tire tracks in the snow do not indicate that plaintiff was sliding in the snow when he hit the trees, but rather they "travel straight forward from the interior of the driveway toward the trees."  (6/4/15 Tr. at  34-35; Exhs. B-2, B-4).  Defendant Hawes

8

agreed that he only noticed "tire tracks leading up to the trees, with all the snow pushed to the opposite side[.]" (6/5/15 Tr. at 36).  Defendant Crouch testified that he recalled seeing the automobile, but not the Bobcat, stuck in the driveway and he never observed the back of the Bobcat striking the trees, only the bucket in the front of it.  (6/4/15 Tr. at 42-43). Defendant Crouch testified that Corey did not ask for their help that day, but even if he had, they would have been reluctant to do so because "[t]here was too much hostility[]" between them.  (6/4/15 Tr. at 44-45).[15]

Within approximately twenty to thirty minutes, defendant Mark Creighton, who is a police officer in East Haddam,[16] arrived, followed about ten minutes later by defendant Hawes, who is a State Police Officer assigned as a Resident State Trooper to the Town of East Haddam;[17] defendants Williams and Crouch explained the circumstances and pointed out the damage to the trees, the dislodging of boulders in the right of way, and the pile of snow behind defendant Williams' Prius.  (Williams Testimony; 6/3/15 Tr. at 93-94, 95; 6/4/15 Tr. at 32).  Only defendant Crouch gave  a written statement to defendant Creighton, defendant Crouch's conversations with defendant Hawes were "brief and unrememberable[,]" and defendant Williams had little, if any, interaction with the police officers.  (6/3/15 Tr. at 95-96; 6/4/15 Tr. at 17-19, 32-33; Exh. 4).  Neither defendant Creighton nor defendant

---

[15]In contrast, plaintiff testified that after not being able to push out Lynch's car, he walked to defendants Williams and Crouch's home, knocked on their door, and asked defendant Crouch to follow him to see "the mess that [he] . . . created[,]" at which time defendant Crouch gave plaintiff "a bunch of excuses about his machine[,]" shrugged his shoulders and returned home. (6/5/15 Tr. at 59-60, 73-74).

[16]Plaintiff's filings erroneously refer to this defendant as Michael Creighton.  (See 6/4/15 Tr. at 50; 6/5/15 Tr. at 24).

[17]The Town of East Haddam is one of a handful of municipalities within Connecticut that uses the State Police in addition to, or in  lieu of, a local police department; the Town is assigned a Resident State Trooper who is supported by the entire barracks, and the Town itself has six police officers.  (6/5/15 Tr. at 24).

Hawes recalled defendant Crouch having mentioned a right of way to them.  (6/4/15 Tr. at 67-69; 6/5/15 Tr. at 31-33).  Defendant Hawes testified that defendant Crouch had indicated that "he wanted to press charges, yes."  (6/5/15 Tr. at 37; see also Exh. 1, at 2 ("we pressed charges."); Exh. 4 ("I want to press charges. . . .")).  The police officers thereafter left the home of defendants Williams and Crouch to continue up the driveway to the Corey residence.  (6/4/15 Tr. at 33).[18]  Defendant Creighton testified that he did not notice any cars being stuck in the snow.  (6/4/15 Tr. at 91).

The Coreys estimate within twenty to twenty-five minutes of plaintiff and Lynch freeing the Honda from the snow, defendants Hawes and Creighton drove up in separate cars to plaintiff's house.  (Lynch Testimony; 6/5/15 Tr. at 76). Upon seeing the police officers, Corey and Lynch exited the house; defendant Hawes spoke only with plaintiff, and defendant Creighton did not speak at all.  (Lynch Testimony; 6/5/15 Tr. at 76-77).   Lynch described defendant Hawes as "not receptive" to plaintiff's explanation, instead cutting him off in their conversation.  (Lynch Testimony).  Plaintiff admitted to defendants Creighton and Hawes that he had damaged the trees using his Bobcat in the common driveway, although defendant Creighton did not recall plaintiff having mentioned the right of way.  (6/4/15 Tr. at 88-89; 6/5/15 Tr. at 77-78; Exhs. 7, K).  Defendant Hawes directed plaintiff to put his arms behind his back, handcuffed him, charged him with Criminal Mischief in the Third

---

[18]The testimony of defendant Creighton, who had never met plaintiff or been to his residence prior to March 9, 2013, and of defendant Hawes was largely consistent.  (6/4/15 Tr. at 54, 55-60, 70, 79-80; 6/5/15 Tr. at 27-34, 36-37, 39-40, 54-55).  Defendant Creighton testified that he has not had any discussions about plaintiff with any town employees, and harbors no bias against him.  (6/5/15 Tr. at 16, 21).  He also testified that he was never advised that defendant Crouch is a "chronic complainer."  (6/5/15 Tr. at 22).   Defendant Hawes similarly testified that he had no prior relationship with defendants Williams and Crouch, had no previous communications with them, and was unaware of any campaign against plaintiff by them.  (6/5/15 Tr. at 52-54).

Degree in violation of CONN. GEN. STAT. § 53a-117,[19] placed him in his State Police car, and

drove off.   (Lynch Testimony; 6/5/15 Tr. at 77-80).   Defendant Creighton agreed that

plaintiff was polite, cooperative, and respectful at the time of his arrest, and it appeared to

him to be a "normal[]" arrest.  (6/4/15 Tr. at 71, 89-90). Defendant Hawes described plaintiff

as "calm" during and after the arrest.   (6/5/15 Tr. at 46).[20] Shortly thereafter, defendant

Creighton asked Lynch and Mrs. Corey to locate plaintiff's wallet, as he had left without it.

(Lynch Testimony; 6/5/15 Tr. at 78-79).   Lynch thereafter delivered plaintiff's wallet to

defendant Creighton. (Debra Corey Testimony).[21] Defendant Creighton did not have any

other discussions with Lynch or Mrs. Corey and did not elicit any statements from them.

(Lynch Testimony; Debra Corey Testimony).

---

[19]See note 25 infra.

[20]Defendant Hawes testified that the ride from plaintiff's home to Troop K in Colchester was a "short drive," approximately ten minutes in the snow, and he did not recall plaintiff complaining of pain in his shoulder from a previous shoulder injury.  (6/5/15 Tr. at 47-48).  In contrast, plaintiff testified that he had advised defendant Hawes of a previous shoulder injury so that plaintiff loosened his shoulder before the handcuffs were applied, but his shoulder was still "killing" him and he so advised defendant Hawes, and plaintiff thought that defendant Hawes traveled on a "nasty" dirt road "full of freaking potholes" to further injure him. (6/5/15 Tr. at 78-80, 108-09, 118-19).  Plaintiff also testified that he had pain in his shoulder prior to March 9, 2013, which was worsened by the handcuffs, so that his pain is "wicked[]" and "just aches like a tooth." (6/5/15 Tr. at 103-09).  He conceded on cross-examination that although he has pain in his shoulder "from time to time[,]" he never went to a doctor or hospital for his shoulder pain.  (6/5/15 Tr. at 118).  Despite this incident, plaintiff described defendant Hawes as "a really nice guy, to tell you the truth."  (6/5/15 Tr. at 119).

[21]Again, the testimony of defendants Creighton and Hawes was largely consistent, namely that after speaking with defendant Crouch, the two of them continued up the driveway to plaintiff's home, that defendant Hawes had a brief conversation with plaintiff, lasting "[a] few minutes[,]"and then handcuffed plaintiff, placed him in his vehicle and drove him to Troop K, where plaintiff went through the usual booking procedures, that defendant Creighton retrieved plaintiff's wallet from Debra Corey and Lynch but did not have any conversation with them other than about the wallet, that defendant Creighton took a statement from defendant Crouch, and that he took photographs of the damaged trees. (6/4/15 Tr. at 61-62, 63-66, 69-71, 87-89; 6/5/15 Tr. at 6, 13-14, 40-41, 42-46, 48, 49-52, 55-56; Exhs. 7, K).   Defendant Creighton later provided the witness statement to defendant Hawes.  (6/4/15 Tr. at 75-77).  Defendants Creighton and Hawes also testified that they did not inspect or photograph plaintiff's Bobcat.  (6/5/15 Tr. at 14-15, 41).

Defendant Williams testified that she did not "coerce" the police officers into arresting plaintiff, and that she and defendant Crouch did not enter into any "conspiracy" with any of the other defendants; defendant Crouch similarly testified that it was "up to the police to make [the] determinations" whether to arrest plaintiff, that he never conspired with the other defendants, and that he has no relationship with defendants Hawes, Creighton, Walters or the Town of East Haddam.  (Williams Testimony; 6/3/15 Tr. at 101; 6/4/15 Tr. at 29-30, 32, 34).[22]  Defendant Creighton confirmed that the decision to arrest plaintiff was made by defendant Hawes.  (6/4/15 Tr. at 77-78).   Defendant Hawes testified that his decision to arrest plaintiff was not influenced by any coercion, encouragement, influence or control by defendants Williams and Crouch, and based upon his conversations with all the parties and his investigation, there was probable cause to arrest plaintiff and he "stands by that decision[.]"  (6/5/15 Tr. at 56).

Defendant Williams estimates that about twenty "mature" hemlock trees were damaged, covering about twenty feet, and she and defendant Crouch agree that it  took them about three days to clean "the mess up[]"; however, they left behind some tree stumps, and one tree that they could not remove, which is still erect because it was wrapped in wire; they have not requested reimbursement from plaintiff for this damage.  (Williams Testimony; 6/3/15 Tr. at 78-79, 111-12; Exhs. 2-3, 20,  B).  Defendant Crouch testified that plaintiff knocked over more than ten evergreen trees which were approximately thirty feet tall, "above the telephone wires," ranging in diameter at the trunks from six to ten inches wide. (6/4/15 Tr. at 33-34). Defendant Crouch testified that the notches in the trees caused

---

[22]Defendant Crouch testified that he once had a "brief chance meeting" with defendant Walters at the town fuel station where defendant Crouch was filling his school bus, at which time he introduced himself to defendant Walters; however, plaintiff was never mentioned.  (6/4/15 Tr. at 30-31, 46-48).

by the Bobcat were "quite high up" on the trees, "approximately eight to ten feet[]" up. (6/4/15 Tr. at 24; Exh. B).   Defendant Creighton testified that he saw that "[a]pproximately" four to six trees had been "knocked over[]" and "were debarked like somebody ran them over and pushed the loader up and peeled the bark up.  Disheveled."  (6/4/15 Tr. at 79). Defendant Hawes testified that he observed at least two trees that had been damaged, "at approximately [the] six to seven foot mark, where there was a large gouge in them.  And then from that point higher, there was bark stripped from them, and they were pushed over towards [defendant] Crouch's front yard." (6/5/15 Tr. at 35-36).   From the police officers' investigation, defendant Hawes believed that the trees had been damaged deliberately. (6/5/15 Tr. at 55).

Defendant Crouch testified that after he and defendant Williams removed the trees, there was one wire hanging down from the line, and he denied that this wire had been hanging for several years and he further denied he prevented utility workers from trimming the trees around the wire.  (6/4/15 Tr. at 48-49).  Defendant Creighton testified he did not observe any broken or downed electrical wires that day.  (6/5/15 Tr. at 19-20).   Defendant Hawes similarly testified that he did not observe any hanging or downed wires, nor did he notice any snow behind any car in the driveway of Williams and Crouch.  (6/5/15 Tr. at 30).

Defendant Williams testified that she has never called the East Haddam Police Department or other municipal authorities to complain about plaintiff, but that defendant Crouch "probably" has called more than three times.  (Williams Testimony).  On April 1, 2013, defendant Crouch submitted a letter to the prosecutor's office in the Middletown Superior Court.  (6/3/15 Tr. at 104-07; Exh. 1).  Defendant Crouch agreed that he has made complaints to the Town of East Haddam against plaintiff, but denied that he had been instructed by town officials to stop.  (6/3/15 Tr. at 126-27, 129; 6/4/15 Tr. at 28-29).

After eleven months, and approximately ten to eleven court appearances, plaintiff "got in a nolle[]" and the criminal charges against him "got thrown out"; plaintiff paid a private attorney $3,300 to $3,400 to represent him on these state charges.  (Debra Corey Testimony; 6/5/15 Tr. at 80, 83-84, 115-17, 123; Exh. 6).[23] Lynch testified that this incident "has consumed [plaintiff] psychologically," that he has been "fixated on it," and has exhibited increased anxiety as a result.  (Lynch Testimony).  Mrs. Corey similarly testified that the prosecution was "absolutely" stressful, it placed a "financial burden" on them, and plaintiff has been "distraught, distressed, not [him]self."  (Debra Corey Testimony).  She further testified that plaintiff does not sleep well and that there is "more stress" in their marital relationship.  (Debra Corey Testimony).   Plaintiff testified that during the prosecution, he would cry, would get "all tensed up[,]" and would have dry heaves; the current situation makes it difficult for him to sleep and to concentrate, and it "eats up my life.  It kills me. I hate dealing with that stuff.  I hate it.  I hate being here.  I just wish this never happened[.]" (6/5/15 Tr. at 85-87).  He agreed the situation has caused stress in his marriage, and it pains him to see his wife "so upset[,]" crying and shaking.  (6/5/15 Tr. at 96-97).  He testified poignantly that if he had sufficient money, he would move away and that he is "done with it.  I really am."  (6/5/15 Tr. at 96).

Tanya Russo, a licensed clinical social worker at United Community Family Services in Colchester, has seen plaintiff every other week since January 2013 for anxiety, major depressive disorder, and post-traumatic stress disorder, plaintiff having transferred to her

---

[23]Defendant Crouch was advised by the prosecutor's office that it was dropping the charges and he had no further discussions with that office. (6/3/15 Tr. at 115-17).  Defendant Creighton testified that he was never contacted regarding the prosecution, had no conversations about it with any of the other defendants, and only learned that the charges had been dropped when he was served with the complaint in this lawsuit.  (6/4/15 Tr. at 72-73).  See also note 25 infra.

from another therapist.  (6/4/15 Tr. at 4-5, 7-8, 9; Exhs. 11-12).  She has been treating him with cognitive behavioral therapy, solution-focused therapy and psychotherapy, expects that he will continue with therapy (which she reevaluates every three months), and does not believe that he will ever be "completely healed."  (6/4/15 Tr. at 9-10).  However, while plaintiff's ongoing dispute with his neighbors and the prosecution are mentioned a few times in her clinical notes, Russo testified that she did not notice any worsening of his symptoms after his arrest on March 9, 2013.  (6/4/15 Tr. at 8-9; Exhs. 11-12).

Plaintiff testified as to the expenses incurred with respect to this litigation, namely the $400 filing fee, $234.39 in service expenses, $481.05 in office supplies, $356.44 for photographs, $160.10 for parking, $500 for security costs, $672 in travel expense, $59.79 for printing, and $14.28 for telephone calls.  (6/5/15 Tr. at 100-01).  He also estimated his damages to be $100,000 for the arrest, $50,000 for his detention, $50,000 for seizure, $350,000 for conspiracy, $50,000 for the search, $350,000 for malicious prosecution, $350,000 for violation of his constitutional rights, $100,000 for his imprisonment, $100,000 for assault, $100,000 for battery, $50,000 for trespass, $100,000 for encroachment of the right of way, $200,000 for defamation of character, $350,000 for future pain and suffering, $350,000 for further treatment, and $350,000 in punitive damages; plaintiff conceded, on cross-examination, that these numbers were "just [drawn] up at random[]" from research at the law library at the Middletown Superior Court.  (6/5/15 Tr. at 102, 119-20, 121-23).  He testified that he also paid $500 to two prior attorneys and $2,236.50 for a psychological evaluation, and anticipates $2,500,000 in future emotional damages.  (6/5/15 Tr. at 103, 117-18).

## II. DISCUSSION

### A.  LEGAL STANDARDS FOR PREJUDGMENT REMEDY

A prejudgment remedy "is generally intended to secure the satisfaction of a judgment should plaintiff prevail."  Cendant Corp. v. Shelton, No. 3:06 CV 854 (JCH), 2007 WL 1245310, at *2 (D. Conn. Apr. 30, 2007)(citation omitted).  Federal Rule of Civil Procedure 64 permits a plaintiff to utilize the state prejudgment remedies available to secure a judgment that might ultimately be rendered in an action. See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty. 415 U.S. 423, 436 n. 10 (1974).  Pursuant to the Connecticut Prejudgment Remedy statute, the standard for issuing a prejudgment remedy is probable cause, so that a prejudgment remedy is appropriate

> [i]f the court, upon consideration of the facts before it and taking into account any defenses, counterclaims or set-offs, claims of exemption and claims of adequate insurance, finds that the [movant] has shown probable cause that such a judgment will be rendered in the matter in the [movant's] favor in the amount of the prejudgment remedy sought . . . .

CONN. GEN STAT. § 52-278d(a).  In the words of U.S. District Judge Alvin W. Thompson:

> The legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. Probable cause is a flexible common sense standard.  It does not demand that a belief be correct or more likely true than false.

Qualitative Reasoning Sys., Inc. v. Computer Scis. Corp., No. 3:98 CV 554 (AWT), 2000 WL 852127, at *10 (D. Conn. Mar. 31, 2000)(internal quotations & multiple citations omitted).

A prejudgment remedy proceeding is "only concerned with whether and to what extent the plaintiff is entitled to have property of the defendant held in the custody of the law pending adjudication of the merits of that action."  Benton v. Simpson, 78 Conn. App. 746, 751-52, 829 A.2d 68, 72-73 (App. Ct. 2003)(citation & internal quotations omitted).

16

Further, while a prejudgment remedy hearing "is not contemplated to be a full scale trial on the merits of plaintiff's claims," Bank of Boston Conn. v. Schlessinger, 220 Conn. 152, 156 (1991)(multiple citations & internal quotations omitted), a plaintiff is "bound to furnish proof of his damage with reasonable probability, and not leave the trial court to speculation and conjecture." Mullai v. Mullai, 1 Conn. App. 93, 95, 468 A.2d 1240, 1242 (App. Ct. 1983)(per curiam).   After a hearing, the Court must "consider not only the validity of the plaintiff's claim but also the amount that is being sought." Calfee v. Usman, 224 Conn. 29, 38 (1992)(citation & internal quotations omitted).  Additionally, the Court must "evaluate not only the plaintiff's claim but also any defenses raised by the defendant." Balzer v. Millward, Civ. No. 3:10 CV 1740(SRU)(HBF), 2011 WL 1547211, at *1 (D. Conn. Apr. 21, 2011), quoting Haxhi v. Moss, 25 Conn. App. 16, 20 (1991)(citation omitted).  See also Morales v. Gourmet Heaven, Inc., 14 CV 1333 (VLB), 2015 WL 3869419, at *2 (D. Conn. June 23, 2015); Garnet Analytics, Inc. v. Diversified Solutions, Inc., 12 CV 716 (WWE), 2013 WL 6511940, at *2 (D. Conn. Dec. 12, 2013); Velasquez v. U.S. 1 Farm, 13 CV 634 (CSH), 2013 WL 6195580, at *1-2 (D. Conn. Nov. 26, 2013); Hsqd, LLC v. Morinville,11 CV 1225 (WWE), 2013 WL 5232557, at *1-2 (D. Conn. Sept. 17, 2013); Roberts v. Triplanet Partners, LLC, 950 F. Supp. 2d 418, 420-21 (D. Conn. 2013); Martinez v. Young & Son Remodeling, LLC, 13 CV 1090 (WWE), 2013 WL 1342284, at *1-2 (D. Conn. Apr. 2, 2013); Dill v. Ron's Golf Car Rental, Inc., 12 CV 137 (JBA), 2013 WL 275690, at *8-9 (D. Conn. Jan 24, 2013); Thompson v. Rizzitelli, 10 CV 71 (JBA), 2011 WL 4899750, at *3 (D. Conn. Oct. 14, 2011).

### B. PROBABLE CAUSE

Plaintiff's application for prejudgment relief turns upon whether plaintiff has shown "probable cause" that a judgment will enter in his favor.  CONN. GEN. STAT. § 52-278(d)(a)(1). "Probable cause"  has been defined by the Connecticut courts as "'a bona fide belief in the

existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it.'" Walpole Woodworkers, Inc. v. Atlas Fencing, Inc., 218 F. Supp. 2d 247, 249 (D. Conn. 2002), quoting Three S. Dev. Co. v. Santore, 193 Conn. 174, 175, 474 A.2d 795 (1984)(citation omitted).   The standard of "probable cause" is less demanding than the "preponderance of the evidence" or the "likelihood of success" standards.   Cendant Corp., 2007 WL 1245310 at *3.   Plaintiff need not "prove [his] case by a preponderance of the evidence, but must show that there is probable cause to sustain the validity of [his] claim." Walpole Woodworkers, 218 F. Supp. 2d at 249 (citation omitted).   See also Dill, 2013 WL 275690, at *9; Thompson, 2011 WL 489750, at *4.[24]

### C.  ARGUMENTS HERE

In his post-trial brief, filed August 29, 2015 (Dkt. #143), plaintiff argues that there was no probable cause for his arrest for Criminal Mischief in the Third Degree[25] on March 9,

---

[24]The damages that a plaintiff claims "need not be established with precision but only on the basis of evidence yielding a fair and reasonable estimate." Savalle v. Kobyluck, No. 3:00 CV 675 (WWE), 2001 WL 1913746, at *2 (D. Conn. Sept. 21, 2001)(citations & internal quotations omitted). While plaintiffs need not establish the amount of damages with "mathematical precision," Rafferty v. Noto Bros. Constr., LLC, 68 Conn. App. 685, 693, 795 A.2d 1274 (2002)(citation omitted), there must exist some evidence sufficient for the court to make a "fair and reasonable" prediction as to likely damages.   Kendall v. Amster, 108 Conn. App. 319, 331, 948 A.2d 1041 (2008)(citation & internal quotations omitted).

In his post-hearing brief (Dkt. #143), plaintiff points to the attorney's fees paid to his criminal attorney, his parking and travel expenses, and the "severe emotional distress related to the experience of facing criminal prosecution." (At 5-6).  In their brief (Dkt. #142), defendants Williams and Crouch question plaintiff's claim for emotional distress, based upon the testimony of LCSW Russo.  (At 16-17).

[25]This section provides:

[A] person is guilty of criminal mischief in the third degree when, having no reasonable ground to believe that such person has a right to do so, such person (1) intentionally or recklessly (A) damages tangible property or another, or (B) tampers with tangible property of another and thereby causes such property to be placed in danger of damage. . . .

2013.  (At 1-2).  Plaintiff argues that he has sustained his burden for all three elements of a malicious prosecution claim against defendants Williams and Crouch, namely that they instigated the criminal proceedings, that they did so without probable cause and with malice, and that the criminal prosecution terminated favorably to plaintiff.  (At 2-5).  Plaintiff argues that by intentionally failing to tell the police officers that the trees were in the middle of plaintiff's right of way, probable cause is negated, in that defendants Williams and Crouch misrepresented or concealed material facts needed to establish the offense. (At 3-5).

In their post-trial brief, filed the previous day (Dkt. #142), defendants Williams and Crouch argue that their action did not amount to "state action" as required under 42 U.S.C. § 1983 (at 5-8), that there was no evidence of any conspiracy between the defendants (at 8-11), that there was probable cause to arrest plaintiff (at 11-14), that the nolle does not negate probable cause for plaintiff's arrest and/or preclude the claim of malicious prosecution (at 14-15), and that the PJR hearing was only limited to the events of March 9, 2013 and not plaintiff's other complaints against these two defendants regarding the right of way (at 15-16).

In their reply brief (Dkt. #144), defendants Williams and Crouch argue that the court lacks subject matter jurisdiction over the Connecticut common law claim for malicious prosecution (at 1-2), and that plaintiff failed to establish probable cause that he would be successful on the merits of his claim for malicious prosecution under Connecticut common law with respect to initiation of the criminal proceeding, termination of the criminal proceeding in his favor, probable cause, and malice (at 2-8).[26]

---

CONN. GEN. STAT. § 53a-117.

[26]In light of the conclusion reached here, there is no need to address the issue of subject matter jurisdiction.

Insofar as plaintiff's brief only addresses the elements of malicious prosecution, this ruling will do the same.[27]   Just a few weeks ago, U.S. District Judge Stefan R. Underhill reiterated that in order "[t]o prevail on a Section 1983 claim of malicious prosecution, the plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." Turner v. Boyle, 13 CV 616 (SRU), 2015 WL 4393005, at *16 (D. Conn. July 15, 2015)(internal quotations & citations omitted).   Judge Underhill further summarized that Connecticut law requires that a plaintiff prove the following four elements in a malicious prosecution claim

> (1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice.

Turner, 2015 WL 4393005, at *16 (citation omitted).   Moreover, a plaintiff "may demonstrate malice by showing that a prosecution was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff, including initiating proceedings without probable cause."   Id. (citation omitted).   As Judge Underhill further explained:

> Under Connecticut state law, a private individual may be held liable for initiating a criminal proceeding if he has insisted that the plaintiff should be prosecuted; for example, by bringing pressure of any kind to bear upon the public officer's decision to commence the prosecution. Alternatively, a private individual may be held liable for initiating a criminal proceeding if he knowingly provides false information to a public officer, even if that person brought no pressure to bear on the public officer and left the decision to prosecute entirely in the hands of that public officer.   If a defendant has made a full and truthful disclosure and has left the decision to prosecute entirely in the hands of the public officer, he cannot be held liable for malicious prosecution.

---

[27]Defendants Williams and Crouch appropriately argue that there was simply no evidence of any conspiracy against plaintiff by these defendants (Dkt. #142, at 8-11), as detailed above in this ruling.

Id. (internal quotations, alterations & multiple citations omitted).  Lastly, "[t]he existence of probable cause is a complete defense to a claim of malicious prosecution."  Id. at *17 (citations omitted).

As plaintiff points out, in this case, there is no dispute that defendant Crouch initiated the criminal proceedings that led to plaintiff's arrest. Defendant Crouch explained that he contacted the East Haddam Police Department to report that plaintiff was in the driveway knocking down trees, and, as testified by defendant Hawes, upon the arrival of the police, defendant Crouch stated that he wanted to press charges against plaintiff. (Williams Testimony; 6/3/15 Tr. at 91-92; 6/5/15 Tr. at 37; see also Exh. 1, at 2 ("we pressed charges."); Exh. 4 ("I want to press charges . . . .")). Therefore, the remaining issues relevant to this action are (1) whether there was probable cause for defendants Williams and Crouch to have contacted the police and for plaintiff's subsequent arrest, and (2) whether defendants Williams and Crouch acted with malice, primarily for a purpose other than that of bringing an offender to justice. The testimony elicited at the three-day PJR hearing and the exhibits submitted to the Court show that probable cause existed for the police to be contacted and for plaintiff's subsequent arrest, and that the actions of defendants Williams and Crouch were not done primarily for a purpose other than bringing an offender to justice. Accordingly, even with the minimal burden in PJR hearings, plaintiff cannot prevail on his claim.

First, defendants Williams and Crouch had legitimate safety concerns about plaintiff's behavior due to the presence of electrical/telephone wires which run through the trees that were being knocked down. Despite the fact that defendant Crouch did not mention any broken or downed electrical wires in his statement to police (Exhs. 4, 7, K), nor did either police officer observe any such wires (6/5/15 Tr. at 19-20, 30), defendants Williams and

Crouch testified at the hearing, and a photograph submitted to the Court confirms, that there are numerous wires crossing through the branches of the trees that run along the driveway. (Williams' Testimony; 6/4/15 Tr. at 32; Exh. 13).  Because defendants Williams and Crouch feared that a falling tree would damage these wires, they had probable cause to contact the police and they were not acting primarily for a purpose other than bringing an offender to justice.

The fact that the trees at issue were located in the right of way (having been planted there by Debra Corey's parents some forty to forty-five years ago), and that defendant Crouch failed to mention this right of way in his conversations with the police officers, does not negate that defendants had probable cause to contact the police. Defendant Crouch was not obligated to discuss the parties' exact property interests when the officers arrived because the right of way was obvious; the police officers drove their vehicle from the street to defendants Williams and Crouch's home before continuing up the right of way to plaintiff's property. Defendant Crouch did not "knowingly provide[] false information to a public officer" by failing to mention the right of way, nor did he bring any "pressure to bear on the public officer [but instead] left the decision to prosecute entirely in the hands of the public officer." Turner, 2015 WL 4393005, at *16 (citations omitted).

In addition to probable cause for defendants Williams and Crouch to contact the police, there was also probable cause for plaintiff's subsequent arrest. Defendant Hawes testified credibly that during his inspection of the scene he noticed "tire tracks leading up to the trees, with all of the snow pushed to the opposite side[.]" (6/5/15 Tr. at 36). He also observed at least two trees that had been damaged "at approximately [the] six to seven foot mark, where there was a large gouge in them. And then from that point higher, there was bark stripped from them, and they were pushed over toward [defendant] Crouch's front

22

yard." (6/5/15 Tr. at 35-36). Based upon these observations, defendant Hawes believed that the trees had been deliberately damaged (6/5/15 Tr. at 55), an opinion which is supported by the multiple photographs in Exh. B. Even if the officer had listened to plaintiff's version of events and believed that the damage to the trees had occurred unintentionally, he still had probable cause to charge plaintiff with criminal mischief in the third degree for "recklessly" damaging another's property. CONN. GEN. STAT. § 53a-117. Plaintiff testified that the heavy Bobcat "was sliding all over[]" because the "driveway was just a sheet of freaking ice[,]" so that plaintiff had "very little control over the machine[]" while he was "trying not to hit [Lynch's] new car." (6/5/15 Tr. at 60, 74, 76).  The fact that this activity occurred in the easement created by the right of way did not give rise to plaintiff being able to "intentionally or recklessly" damage several trees located in the right of way.  Il Giardino, LLC v. Belle Haven Land Co., 254 Conn. 502, 528 (2000)(an easement is "considered a nonpossessory interest in land because it generally authorizes limited uses of the burdened property for a particular use.")(citations omitted).  Therefore, whether plaintiff's behavior was intentional or reckless, there was probable cause for his arrest.[28]

### III. CONCLUSION

For the reasons stated above, plaintiff's Application for Prejudgment Remedy (Dkt. #43) is denied.

This is not a Recommended Ruling, but a ruling on a non-dispositive motion,[29] the

---

[28]In light of this conclusion, there is no need to address the implications of the nolle.

[29]It has long been the rule in this district that a PJR application is a non-dispositive motion and upon referral to a Magistrate Judge, does not require a recommended ruling.  Aetna Life Ins. Co. v. Tooth Savers Dental Serv., No. 96 CV 102453(GLG), 1997 WL 102453, at *1 (D. Conn. Feb. 5, 1997).  See also Garnet Analytics, 2013 WL 6511940, at *9, n.9; Hsqd, 2013 WL 523557, at 8, n.3; Martinez, 2013 WL 1342284, at *6, n.6; Dill, 2013 WL 27560, at *11, n.28; Thompson, 2011 WL 4899750, at *5, n. 14; Balzer v. Millward, 10 CV 1740 (SRU), 2011 WL 1547211, at *5, n.7 (D. Conn. Apr. 21, 2011); CapitalSource Fin. LLC v. Autorino, 09 CV 2148 (RNC), 2011 WL 1195857, at

standard of review of which is specified in 28 U.S.C. § 636; FED. R. CIV. P. 6(a) & 72; and Rule 72.2 of the Local Rules for United States Magistrate Judges.  As such, it is an order of the Court unless reversed or modified by the District Judge upon timely made objection.

<u>See</u> 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; <u>Small v. Secretary of HHS</u>, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.[30]

Dated at New Haven, Connecticut, this 17th day of September, 2015.


/s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge

---

*1, n.1 (D. Conn. Mar. 11, 2011); <u>United of Omaha Life Ins. Co. v. Conn. Student Loan Found'n</u>, 718 F. Supp. 2d 277, 286 (D. Conn. 2010).

[30]The sharing of this driveway between these two sets of neighbors is completely unsustainable, particularly as winter is approaching, and is predicted to be another harsh one. There is little doubt from the multiple photographs submitted as evidence that both parcels of property are part of the treasured, classic New England landscape – bucolic, rural, winding roads, magnificent trees, and lovely bodies of water.  Particularly now that plaintiff has counsel, the parties would do well by attempting to resolve this matter, on their own or with the assistance of this judicial officer, but perhaps more appropriately, with the assistance of an experienced real estate attorney, who can suggest alternatives to the present arrangement, which only causes unnecessary angst between all parties.  Both sides deserve to enjoy their magnificent property without constant irritation and apprehension.